MANUEL GASPAR *vs.* CALLAN CONSTRUCTION COMPANY.

JANUARY 8, 1942.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker & Condon, JJ.

FLYNN, C. J. This is an appeal by respondent corporation from a decree entered in the superior court awarding relief to the petitioner under the workmen's compensation act, general laws 1938, chapter 300.

The respondent contends that the trial justice committed an error of law because there was no legal evidence to support his finding that the petitioner, at the time of his injury, was an employee of the respondent. It asserts that the evidence, on the contrary, conclusively shows that petitioner at that time was an employee of another corporation.

The evidence shows the following facts. Respondent Callan Construction Company was a Rhode Island corporation engaged in construction work in this state and elsewhere in New England. Montaup Sand & Gravel Company, hereinafter referred to as Montaup Company, was a Massachusetts corporation engaged chiefly in producing "aggregate" for sale to the respondent and other contractors. It could also take contracts for construction work and did so occasionally, but only in Massachusetts.

The officers and directors of these two corporations were identical. The major bookkeeping for both was done in one office in Bristol, Rhode Island, under George F. Marz, who was secretary of both. General Luke H. Callan was president, treasurer, and general manager of both corporations.

Petitioner testified that he had previously worked for respondent over a period of about thirteen years on construction jobs in various states in New England, and that he never was told and never knew that Montaup Company was a separate corporate business. According to his testimony "Montaup plant" in Swansea, Massachusetts, always belonged to the respondent.

Some time after the petitioner had severed his connection with the respondent, he was employed in Bristol by one Salvador Nunes. While so employed, he was visited by Joseph Sylvia, a workman for respondent, who brought a message from John Callan, boss mechanic for respondent. Neither Callan nor Sylvia worked for any company except the re-

spondent. Sylvia testified that he told petitioner there was a job "if he wanted to go to work at Montaup". Petitioner testified that Sylvia told him "they wants me on the job" and that they wanted him "back at the job" and in another place that they directed him to go to "not Montaup . . . to Gulf Bridge". Petitioner, in reply to Sylvia, said that he would return if his then employer Nunes would approve; otherwise, he would not.

Later that day, according to petitioner, General Callan met him and Nunes and asked the latter if he would release the petitioner and permit him to go back to work for him. Nunes consented and the petitioner was then instructed by General Callan to report the next morning at the Gulf Bridge job in Fall River, Massachusetts. This incident took place, according to petitioner and Nunes, at the close of the day's work near a Nunes' job. According to General Callan, it occurred in the respondent's own yard in Bristol. In any event, it is clear that the name Montaup was not mentioned by anybody in any way at this meeting.

As a result thereof, petitioner went, on the following morning, to Gulf Bridge in Fall River. One DeCosta was foreman on that job and also on another at Hix Bridge. DeCosta testified that these were Montaup Company's jobs but he did not expressly tell petitioner which corporation had the Gulf Bridge contract, or with what company petitioner was engaged; and there was admittedly no Montaup Company sign on that job. There was, he testified, a Montaup sign at Hix Bridge where he had his office for both jobs; but that was some nine miles from Gulf Bridge. Moreover, there was some other testimony to the effect that respondent's name also had been on that office door. DeCosta also testified that he served, as occasion demanded, as foreman for respondent on its own jobs.

On the afternoon of April 6, 1939, the day before the accident, petitioner was told by one "Hawley", evidently referring to a Mr. Foley, who was an officer of both corporations, to report at the Montaup plant the next morning, which he

did. Apparently that was the only time since his reemployment that he had been ordered to report or had reported at the Montaup plant. From there he was taken in respondent's truck to the Fall River job. Having finished earlier than usual that afternoon, he returned with others by truck to the Montaup plant instead of awaiting transportation to Bristol. At the order of one Delphine Cormontue, referred to throughout the transcript as "Delphine", petitioner was engaged in placing blocks beneath a pile driver on a truck when he suffered an accidental injury, resulting in the loss of his arm. It does not appear expressly that Delphine was working for the Montaup Company at the time, or that the truck and pile driver belonged to that company. The petitioner testified that the tools belonged to respondent and were kept at the Montaup plant; and that it was customary for respondent to transport men and tools from there to any given job of respondent.

Respondent introduced samples of the pay envelopes which were used by both companies. On the inside of the flap were stamped, under the title "Earnings", the names of these two corporations and of another, which also had identical officers and directors, but which is not involved here. The bookkeeper would mark on this stamped form the amount of wages that was to be charged to the respective company. On the back of the envelope proper, clearly visible when the flap was open or torn off completely, appeared a printed form on which the employee's wages were broken down to show the total hours and wages, less deductions for federal old age security, unemployment insurance, other deductions, and the net amount of wages due. The bookkeeper also testified that petitioner's wages from the time of his reemployment to the date of the accident had been charged to Montaup Company and had so appeared on each pay envelope. Payroll records for a year previous to the accident showed charges of wages at different times to one or the other of these companies, including the splitting of a week in some instances.

From our examination of this and other evidence, we cannot agree with the respondent's contention. There is. some evidence which might tend to support the respondent's inference that petitioner when injured was not in the course of employment by the respondent. But there is also legal evidence which reasonably supports the trial justice's findings, in substance, that the petitioner had been employed previously by the respondent for many years; that, after a short absence, during which petitioner worked for a different employer, he was reemployed by respondent; that he never understood or consented to any transfer of his contract of employment from the respondent to Montaup Company, and that he was injured in the course of employment by the respondent.

If, as respondent contends, petitioner was reemployed by or for Montaup Company when he was ordered to report for work at Gulf Bridge, that fact was never disclosed expressly in any way. Nor did General Callan, DeCosta, or anybody else mention at any time that Montaup Company was the contractor on the Gulf Bridge job. Moreover, there were no facts in evidence from which it must be necessarily implied that the petitioner knew or reasonably should have known that he was being employed by or for the Montaup Company.

If, therefore, petitioner was reemployed by respondent without any reference to his working for Montaup Company, we are of the opinion that his contract of employment could not be transferred by respondent to Montaup Company without petitioner's knowledge and consent, express or implied. The decided cases involving the liability of so-called simultaneous and successive employers under workmen's compensation do not appear to be entirely in accord in all particulars. But the principle appears to be well established that, in the absence of special statutory provision, an employer may not transfer his employee's contract of employment to another employer so as to make the latter *alone* liable under workmen's compensation, unless that employee has expressly or impliedly consented to such transfer. Among

the cases recognizing this principle, apart from other questions and conclusions based on the particular facts thereof, see *Anderson* v. *Polleys,* 53 R. I. 182; *Scribner's Case,* 231 Mass. 132; *Murray* v. *Union Railway Co.,* 229 N. Y. 110; *Miller* v. *National Chair Co.,* 18 A. 2d. 847 (N. J.); *Parsons* v. *Daly & Sons,* 114 Conn. 143; *Torsey's Case,* 130 Me. 65.

In the instant case there is no evidence that petitioner knew of or expressly consented to any substitution of Montaup Company as his employer and there is none from which that result must be implied as a matter of law. In our opinion any possible notice to petitioner, by virtue of the stamp and figures placed upon the inside of the envelope flap by one bookkeeping department for such closely related companies, was, to be sure, one circumstance to be considered with all the evidence; but, like payment of wages generally, it was not by itself necessarily controlling. Nor would the evidence relating to Montaup Company's sign on the gravel bank in Swansea or on the office door at Hix Bridge—both being in dispute to some extent—require the trial justice to find that petitioner was solely in the employment of Montaup Company. In the circumstances here there was legal evidence to support the trial justice's findings that petitioner neither understood nor consented to a transfer of his services by respondent to Montaup Company, and that the petitioner was injured while in the course of employment by respondent.

The respondent's appeal is therefore denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

*William H. McSoley, William H. McSoley, Jr.,* for petitioner.

*Hinckley, Allen, Tillinghast & Wheeler, S. Everett Wilkins, Jr., Edward M. Watson,* for respondent.